**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CENTRAL DELTA WATER AGENCY;
SOUTH DELTA WATER AGENCY;
ALEXANDER HILDEBRAND; R. C.
FARMS, INC.,
           *Plaintiffs-Appellants,*

and

SAVE SAN FRANCISCO BAY
ASSOCIATION; NATURAL RESOURCES
DEFENSE COUNCIL; ENVIRONMENTAL
DEFENSE FUND; BAY INSTITUTE OF
SAN FRANCISCO; PACIFIC COAST
FEDERATION OF FISHERMEN'S
ASSOCIATIONS; UNITED ANGLERS OF
CALIFORNIA,
           *Intervenors,*

v.

BUREAU OF RECLAMATION, UNITED
STATES DEPARTMENT OF INTERIOR;
GALE A. NORTON, Secretary of the
Interior; MICHAEL J. SPEARS,
Regional Director, US Dept. of
Interior, Fish and Wildlife Service,
Region 1; KIRK RODGERS, Acting
Regional Director, Dept. of
Interior, Bureau of Reclamation,
Mid-Pacific Region; DEPARTMENT
OF FISH AND GAME, STATE OF
CALIFORNIA; ROBERT C. HIGHT,
           *Defendants-Appellees,*

No. 04-16632

D.C. No.
CV-99-05650-OWW

ORDER AND
AMENDED
OPINION

SAN JOAQUIN RIVER GROUP
AUTHORITY; OAKDALE IRRIGATION
DISTRICT; SOUTH SAN JOAQUIN
IRRIGATION DISTRICT; MERCED
IRRIGATION DISTRICT; MODESTO
IRRIGATION DISTRICT (MID);
TURLOCK IRRIGATION DISTRICT; SAN
JOAQUIN RIVER EXCHANGE
CONTRACTORS WATER AUTHORITY,
          *Defendants-Intervenors-*
                      *Appellees,*

                 v.

STOCKTON EAST WATER DISTRICT,
          *Plaintiff-Intervenor.*

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
April 3, 2006—San Francisco, California

Filed May 22, 2006
Amended June 23, 2006

Before: Warren J. Ferguson, Stephen S. Trott, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Trott

**COUNSEL**

Daniel A. McDaniel, Nomellini, Grilli & McDaniel Professional Law Corporations, Stockton, California, for the plaintiffs-appellants.

David C. Shilton, Assistant United States Attorney, Washington, D.C., for the defendants-appellees.

Tim O'Laughlin and William C. Paris, III, O'Laughlin & Paris LLP, Chico, California, for the defendants-intervenors-appellees.

**ORDER**

The Opinion filed May 22, 2006 is amended as follows:

**1.** At page *2 of the Opinion, found at ___ F.3d ___, 2006 WL 1377447 (9th Cir. 2006), in the third full paragraph in the left-hand column, the sentence "The gauging station at Vernalis is located close to the ocean, below the confluence of the two major rivers." is replaced with:

> "The gauging station at Vernalis is located below the confluence of the Stanislaus River and the San Joaquin River."

**2.** At page *2 of 2006 WL 1377447, in the fourth full paragraph that spans both the left-hand and right-hand columns, the sentence "While nothing in the Act requires that the

Bureau use New Melones water for its § 3406(b)(2) releases, the State Board exercised its discretion to use that water." is replaced with:

> "While nothing in the Act requires that the Bureau use New Melones water for its § 3406(b)(2) releases, the Bureau exercised its discretion to use that water."

**3.** In the listing of counsel for Plaintiffs-Appellants, before page *1 of 2006 WL 1377447 (9th Cir. 2006), in the left hand column, counsel's listing as "Daniel A. McDaniel, Nomellini, Grilli & McDaniel Professional Law Corporation, Stockton, California, for the plaintiffs-appellants." is replaced with:

> "Daniel A. McDaniel, Nomellini, Grilli & McDaniel Professional Law Corporations, Stockton, California, for the plaintiffs-appellants."

---

## OPINION

TROTT, Circuit Judge:

Plaintiffs Central Delta Water Agency, South Delta Water Agency, Alexander Hildebrand, and R. C. Farms, Inc. ("Delta parties") appeal the district court's denial of their motion for summary judgment and grant of defendant the United States Bureau of Reclamation's ("Bureau") motion for summary judgment. The Delta parties sued the Bureau and several administrative officials, claiming that the Bureau was violating the Central Valley Improvement Act because it was operating the Central Valley Project ("CVP or Project") in a manner that would at some point in the future violate the Vernalis Salinity Standard, a state standard with which the Bureau must comply in its operation of the CVP.[1] The district

---

[1] Various parties intervened in the lawsuit, but we discuss only the Delta parties and the Bureau.

court cited several grounds for its decision, but we find dispositive the absence of a genuine issue of material fact as to whether the Bureau will comply with the Vernalis Salinity Standard in the foreseeable future. Therefore, we affirm the district court's denial of the Delta parties' motion and grant of the Bureau's motion for summary judgment.

# I

The CVP is the largest federal water management project in the country. It includes two of California's major rivers, the Sacramento and the San Joaquin, which meet at the Sacramento-San Joaquin Delta. The rivers mix at the delta and then flow into San Francisco Bay and ultimately out to the Pacific Ocean. The Bureau, a division of the Department of the Interior, operates the Project and holds permits from the California State Water Resources Control Board ("State Board") to appropriate water and distribute it for various beneficial uses. One of the reservoirs operated by the Bureau is the New Melones Unit, located on the San Joaquin River system.

In 1992, Congress passed the Central Valley Project Improvement Act ("CVPIA" or "Act"). The purposes of the Act are

> (a) to protect, restore, and enhance fish, wildlife, and associated habitats in the Central Valley and Trinity River basins of California;

> (b) to address impacts of the Central Valley Project on fish, wildlife and associated habitats;

> (c) to improve the operational flexibility of the Central Valley Project;

> (d) to increase water-related benefits provided by the Central Valley Project to the State of California

through expanded use of voluntary water transfers and improved water conservation;

(e) to contribute to the State of California's interim and long-term efforts to protect the San Francisco Bay/Sacramento-San Joaquin Delta Estuary;

(f) to achieve a reasonable balance among competing demands for use of Central Valley Project water, including the requirements of fish and wildlife, agricultural, municipal and industrial and power contractors.

CVPIA § 3402, Title XXXIV of the Reclamation Projects Authorization and Adjustment Act of 1992, Pub. L. 102-575, 106 Stat. 4600, 4706 (1992).

The Act requires that the Secretary

dedicate and manage annually eight hundred thousand acre-feet of Central Valley Project yield for the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures authorized by this title; to assist the State of California in its efforts to protect the waters of the San Francisco Bay/Sacramento-San Joaquin Delta Estuary; and to help to meet such obligations as may be legally imposed upon the Central Valley Project under State or Federal law following the date of enactment of this title . . . .

CVPIA § 3406(b)(2). In addition, the CVPIA requires the Secretary of the Interior to "develop and implement a program . . . for the acquisition of a water supply to supplement the quantity of water dedicated to fish and wildlife purposes under" § 3406(b)(2). CVPIA § 3406(b)(3).

The Act states that the Secretary of the Interior "immediately upon the enactment of this title, shall operate the Central

Valley Project to meet all obligations under State and Federal law," including the decisions of the State Board. CVPIA § 3406(b). "In short, the Act demands that the Project implement a significant fish habitat protection program, but that it do so in accordance with the applicable state water use permits." *Cent. Delta Water Agency v. United States* (*Central Delta I*), 306 F.3d 938, 945 (9th Cir. 2002).

One such state permit standard is known as the Vernalis Salinity Standard. The gauging station at Vernalis is located below the confluence of the Stanislaus River and the San Joaquin River. The Vernalis Salinity Standard, initially set by the State Board at 500 parts per million total dissolved solids, is now set at an electrical conductivity measurement of 1.0 mmhos/cm during the period of September through March and 0.7 mmhos/cm during the irrigation months of April through August. The Bureau is required, both by the terms of its water permits and by the CVPIA, to operate the CVP so as not to exceed the 0.7-1.0 mmhos/cm salinity standard. All parties agree that the Bureau has not violated the Vernalis Salinity Standard since 1994.

The Bureau periodically releases water from the New Melones Unit, pursuant to § 3406(b)(2) of the Act, to create flows sufficient to maintain wildlife habitats. While nothing in the Act requires that the Bureau use New Melones water for its § 3406(b)(2) releases, the Bureau exercised its discretion to use that water. *Central Delta I*, 306 F.3d at 945. In 1997, the Bureau adopted the New Melones Interim Operations Plan ("Plan"). The Plan provides for (b)(2) water releases from New Melones, as well as the purchase of water, under § 3406(b)(3), from other water users. The Plan was initially intended to be temporary, but, for lack of a better program, the Bureau has continued to operate the CVP under the Plan since its adoption.

The Plan includes a model showing a possibility that the Vernalis Salinity Standard might be violated in the future. The

model consists of a 71-year projected study of the operation of the CVP under the Plan. That model showed that in 37 of the 71 years there would be at least one violation of the standard, and that violations would occur in 88 of the 852 months covered by the study (approximately 10%). Although the Bureau operates the Project pursuant to this Plan, the Bureau does not blindly adhere to it: the Bureau deviates from the Plan when necessary in order to meet its various obligations, including compliance with the Vernalis Salinity Standard.

The Delta parties sued the Bureau for injunctive relief, claiming that the Bureau may not release any water from New Melones under § 3406(b)(2) or purchase water under § 3406(b)(3) unless it first dedicates a sufficient amount of water to ensure that the Vernalis Salinity Standard is satisfied. The Delta parties asserted that the (b)(2) releases and the (b)(3) purchases decrease the amount of water that will flow down to Vernalis during irrigation months, thus resulting in a higher salinity content of the water. The Delta parties alleged that a higher salinity content will injure the crops irrigated by the water. Relying on the Bureau's modeling, the Delta parties contended that the Bureau's operation of the Project under the Plan threatened a violation of the Vernalis Salinity Standard.

The district court initially held that the Delta parties lacked standing to challenge the Bureau's Plan because there had been no violation of the standard since 1994. We reversed, holding that the Bureau's modeling created a risk of harm to the Delta parties sufficient to confer standing: "a credible threat of harm is sufficient to constitute actual injury for standing purposes, whether or not a statutory violation has occurred." *Central Delta I*, 306 F.3d at 950.

On remand, the Delta parties and the Bureau moved for summary judgment. The district court denied the Delta parties' motion and granted the Bureau's motion. *See* Fed. R. Civ. P. 56(c). Among other grounds, the district court held

that the Delta parties could not show, "within reasonable scientific certainty," that the Bureau would violate the Vernalis Salinity Standard in the future. *Cent. Valley Water Agency v. United States*, 327 F. Supp. 2d 1180, 1218 (E.D. Cal. 2004).

## II

We review de novo a district court's decision on cross-motions for summary judgment. *Magana v. Northern Mariana Islands*, 107 F.3d 1436, 1438 (9th Cir. 1997). "We must determine, viewing the evidence in the light most favorable to . . . the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## III

**[1]** As an initial matter, the Delta parties argue that they need not show an actual violation of the CVPIA because our prior decision in *Central Delta I* is the "law of the case." There is no such law of the case, however, because our decision on standing does not obviate the need to address the merits of the litigation. *See Cardenas v. Anzai*, 311 F.3d 929, 933 (9th Cir. 2002) (meaning of statute is a question of law that does not affect standing); *Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (court of appeals improperly confused the question of standing with the question of whether plaintiff had a cause of action). The Delta parties cannot stand on our prior decision to avoid the need to demonstrate an imminent statutory violation.

The Delta parties have failed to show that the Bureau has committed such a violation. We find meritless the Delta parties' contention that § 3406(b)(2) requires that the Bureau dedicate and allocate a specific amount of water to meet the Vernalis Salinity Standard before it may do anything else.

After directing the Secretary to manage 800,000 acre-feet of "Central Valley Project yield," the statute continues:

> For the purpose of this section, *the term "Central Valley Project yield" means the delivery capability of the Central Valley Project during the 1928-1934 drought period after fishery, water quality, and other flow and operational requirements* imposed by terms and conditions existing in licenses, permits, and other agreements pertaining to the Central Valley Project under applicable State or Federal law existing at the time of enactment of this title *have been met.*

CVPIA § 3406(b)(2) (emphasis added). The Delta parties seize on the word "after," claiming that it unambiguously requires an allocation of water for all pre-CVPIA requirements prior to any releases for fishery purposes.

[2] However, this portion of the statute is merely a definition. The clear language of § 3406(b)(2) first requires the Bureau to dedicate and manage 800,000 acre-feet of "Central Valley Project yield." It then goes on to define "Central Valley Project yield" as the amount of water, assuming hydrological conditions of the period of 1928-1934, after pre-CVPIA requirements are met. The statute does not direct the Bureau to allocate a specific amount of water to pre-CVPIA purposes prior to exercising its discretion to achieve its other purposes.

[3] The Delta parties are correct that the Bureau lacks the discretion to violate the Vernalis Salinity Standard. However, the Act leaves to the agency's discretion the decision of *how* to comply with those standards. The Bureau has consistently met the Vernalis Salinity Standard under its current Plan, even though the Plan's model showed that it would violate the standard 10% of the time. The Bureau's discretion to modify the Plan to account for changes in conditions, therefore, seems to be working just fine.

**[4]** Not only has there been no violation of the Vernalis Salinity Standard in over a decade, the Delta parties have failed to raise a genuine issue of material fact as to whether the Bureau will comply with the standard in the foreseeable future. The Delta parties' reliance on the Plan's modeling to attempt to create a factual issue suffers from two major flaws. First, the model is based on hypothetical conditions. *Actual* hydrological conditions will undoubtedly and frequently change during the Bureau's operation of the Project.

**[5]** Second, the model's prediction that the Plan will violate the Vernalis Salinity Standard in 10% of the months assumes the Bureau's continuous and unswerving adherence to the Plan. However, the Plan itself is merely a starting point, and the Bureau modifies its operation of the CVP as conditions on the river system change. The Bureau conceded at oral argument that it is legally obligated to meet the Vernalis Salinity Standard, even if it must deviate from its Plan in order to do so. It is undisputed that such deviation has occurred in the past when a violation of the salinity requirement has been threatened. It is within the Bureau's discretion to determine the means by which it will satisfy the Vernalis Salinity Standard, and if the Bureau must depart from the Plan to ensure compliance, it will. As Dwight D. Eisenhower so aptly put it, "Plans are nothing; planning is everything."

**IV**

**[6]** It is clear that the Bureau must comply with the Vernalis Salinity Standard. It is equally clear that the Bureau's is an extremely difficult task: to operate the country's largest federal water management project in a manner so as to meet the Bureau's many obligations. Recognizing this difficulty, Congress granted the Bureau considerable discretion in determining how to meet those obligations. The Bureau admits that it is required to violate its own Plan if necessary to provide flows sufficient to lower the salinity of the water to the levels required by the Vernalis Salinity Standard. It has done so in

the past, and nothing in the record suggests that it will not continue to do so in the future. That strict adherence to the Plan might result in violations of the standard establishes neither a factual issue nor a right to injunctive relief, because the Bureau admits that it must violate its Plan rather than violate the salinity requirement. There is no genuine issue of material fact as to the Bureau's future compliance with the Vernalis Salinity Standard, and the judgment of the district court is therefore

**AFFIRMED**.