352 F.3d 625
 Michael BAUR, Plaintiff-Appellant,
Farm Sanctuary, Inc., Plaintiff
v.
Ann M. VENEMAN, in her official capacity as Secretary, United States Department of Agriculture & United States Department of Agriculture, Defendants-Appellees.
 Docket No. 02-6249.
 United States Court of Appeals, Second Circuit.
 Argued: June 26, 2003.
 Decided: December 16, 2003.
 
 COPYRIGHT MATERIAL OMITTED SHELDON EISENBERG, Bryan Cave LLP (Michael G. Biggers and Kira P. Watson, on the brief), Santa Monica, CA, for Plaintiff-Appellant.
 EDWARD CHANG, Assistant United States Attorney (James B. Comey, United States Attorney for the Southern District of New York, Meredith E. Kotler, Assistant United States Attorney, of counsel), New York, NY, for Defendants-Appellees.
 Before: STRAUB and POOLER, Circuit Judges, and HURD, District Judge.*
 Judge POOLER dissents in a separate opinion.
 STRAUB, Circuit Judge.
 
 
 1
 This appeal centers on a narrow issue of standing in the context of a category of progressive neurological diseases, Transmissible Spongiform Encephalopathies ("TSEs"), of which the most widely publicized example is Bovine Spongiform Encephalopathy ("BSE," commonly known as "mad cow" disease), a fatal neuro-degenerative disease that affects the central nervous system of adult cattle.[1] Plaintiff, Michael Baur ("Baur"), has filed suit to require defendants, Ann M. Veneman, Secretary of Agriculture, and the United States Department of Agriculture ("USDA") to ban the use of downed livestock as food for human consumption. "Downed" is an industry term used to describe animals that collapse for unknown reasons and are too ill to walk or stand prior to slaughter. Baur alleges that downed livestock are particularly likely to be infected with TSEs, as TSEs typically cause animals to lose coordination and the ability to stand upright.
 
 
 2
 Under current USDA regulations, downed livestock may be used for human consumption after passing a mandatory post-mortem inspection by a veterinary officer. Baur claims that this policy violates the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. §§ 601-605, and the Federal Food, Drug, and Cosmetic Act ("FFDCA"), 21 U.S.C. §§ 301-399, and further alleges that the consumption of downed animals creates a serious risk of disease transmission — most specifically the risk that humans will contract a fatal form of TSE known as variant Creutzfeldt-Jacob disease ("vCJD") by eating BSE-contaminated beef products.
 
 
 3
 Without reaching the merits of Baur's suit, the District Court, (Naomi Reice Buchwald, Judge), granted defendants' motion to dismiss for lack of standing, concluding that Baur's exposure to meat products from downed livestock was insufficient to establish a cognizable Article III injury-in-fact. Focusing on Baur's inability to allege that BSE has ever been detected in the United States or that BSE-contaminated food products had ever been offered for sale in this country, the District Court reasoned that the alleged risk of disease transmission was too hypothetical and speculative to support standing. See Farm Sanctuary, Inc. v. Veneman, 212 F.Supp.2d 280, 282-84 (S.D.N.Y.2002). Because we conclude that exposure to an enhanced risk of disease transmission may qualify as injury-in-fact in consumer food and drug safety suits and further find that Baur has alleged a sufficiently credible risk of harm to survive a motion to dismiss, we vacate the judgment of the District Court and remand for further proceedings.
 
 BACKGROUND
 
 4
 The underlying administrative challenge in this suit arises from a March 4, 1998 petition which Baur filed with the USDA and the Food and Drug Administration ("FDA"). Baur requested that the agencies immediately "label all downed cattle as adulterated" pursuant to the FFDCA, 21 U.S.C. § 342(a)(5), which provides that any food that is "in whole or part, the product of a diseased animal" shall be deemed "adulterated."[2] Baur argued that downed cattle are classified as "diseased" according to the USDA's own regulations, see 9 C.F.R. § 301.2 (2003) (defining "dying, diseased, or disabled livestock" as including animals displaying a "lack of muscle coordination" or an "inability to walk normally or stand"), and therefore, necessarily fall within the FFDCA's definition of adulteration.
 
 
 5
 Because humans who consume meat products from BSE-infected cattle may contract vCJD, a fatal neurological disease for which there is no effective treatment or cure, Baur argued that exposure to downed cattle posed a significant health risk and that the elimination of downed cattle from the food stream was necessary to protect public health. In his petition, Baur claimed that the British outbreak of mad cow disease had already "demonstrated the very real threat of human disease through exposure to BSE," — a threat made all the more serious by scientific research suggesting that downed cattle in the United States may already be infected with a unidentified variant of BSE.
 
 
 6
 Baur also argued that preventing the human consumption of downed cattle was necessary, because "current [BSE] surveillance efforts, including slaughterhouse inspection procedures," could provide only limited screening. Pointing out that the required "ante-mortem inspection of downed cattle commonly takes five minutes or less," and that "[i]t would be very difficult to identify central nervous system (CNS) symptoms in this amount of time," Baur noted that existing inspection procedures provided only a partial safeguard against disease transmission. "More importantly, although there are observable clinical signs of BSE," scientists believe that BSE has a long incubation period of up to eight years during which there may be no observable symptoms and as a result BSE "can only be confirmed following [post-mortem] histologic examination of the brain."
 
 
 7
 In May 1998, Baur submitted an amended petition, seeking to expand his original request for administrative action. Citing a recently published study which allegedly raised the possibility that BSE infectivity may persist in animals previously thought to be BSE-resistant, Richard Race and Bruce Chesboro, Scrapie Infectivity Found in Resistant Species, NATURE, Vol. 392, 770 (1998),[3] Baur claimed that all downed livestock, and not just downed cattle, should be classified as adulterated under the FFDCA and banned for human consumption due to the risk of disease transmission.
 
 
 8
 The Food Safety and Inspection Service ("FSIS"), a division of the USDA, denied Baur's administrative petition on May 25, 1999, concluding that it was not required under the FFDCA "to remove all downed cattle without exception, from the nation's food supply." Contrary to Baur's interpretation of the applicable food safety statutes, FSIS stated that it was bound by the definition of adulteration set forth in the FMIA, and not the FFDCA, for all livestock presented for slaughter at a federally inspected slaughter establishment. FSIS argued that, unlike the FFDCA, the FMIA did not automatically classify all products from a diseased animal as adulterated. FSIS also explained that its regulations for downed livestock were consistent with the FMIA which permits the carcasses of diseased animals to be passed for human food if a FSIS veterinary officer determines that the carcass is safe for human consumption.[4] In addition, FSIS disputed Baur's claim that all downed livestock should be classified as diseased pursuant to 9 C.F.R. § 301.2, pointing out that the regulation refers to both "diseased" as well as "disabled" livestock and noting that a disabled animal, suffering from a broken leg, would not require condemnation as a potential health threat.
 
 
 9
 Finally, FSIS defended the adequacy of current federal inspection policies, stating that: "It is not difficult to distinguish a recumbent cow ... affected with a cental nervous system (CNS) condition. If proper clinical observations are combined with an adequate history and appropriate laboratory test evaluations, a differential diagnosis is possible in the vast majority of cases." FSIS also disagreed with Baur's assessment of the potential risk of disease transmission from downed livestock, noting that:
 
 
 10
 [T]he consensus of the scientific literature is that BSE does not exist in the U.S. BSE has not been detected in this country, despite active surveillance efforts for several years. Since 1990, nearly 6,500 specimens, from animals in 43 states, have been laboratory tested by an ongoing BSE surveillance system in the U.S. No evidence of BSE (in the form of characteristic lesions) or related transmissible spongiform encephalopathies (TSE) has been seen. In addition, to prevent BSE-contaminated animals or animal products from entering the U.S., severe restrictions exist on the importation of live ruminants and ruminant products from countries where BSE is known to exist.
 
 
 11
 Following the denial of his petitions and the failure of subsequent discussions with the USDA, Baur filed suit in the District Court seeking judicial review of the USDA's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. The complaint briefly summarizes the allegations made in Baur's prior petitions, specifically alleging that downed livestock are more likely to be affected with diseases such as TSEs, and that given the inherent limitations in current BSE testing capabilities, "it is simply impossible to determine with certainty whether a downed animal is infected with BSE" by relying on a slaughterhouse inspection scheme. Baur claims standing to pursue his APA claims as "a regular consumer of meat products who is concerned about eating adulterated meat." He alleges that "each time he eats meat he is at risk of contracting a food-borne illness such as vCJD," and is consequently "injured by the risk that he may consume meat that is the product of a downed animal, and by his apprehension and concern arising from this risk."
 
 
 12
 Defendants subsequently moved to dismiss Baur's complaint, arguing, inter alia, that Baur lacked standing to bring suit because he did not allege that BSE had ever been detected in the United States. In the absence of any allegation that BSE has spread to the United States, defendants claimed that Baur's asserted injury was simply speculative and "based on a series of hypothetical events" — that BSE will enter the country, that existing surveillance and inspection procedures will fail to detect downed animals infected with BSE, and finally that Baur will consume the meat from an infected animal. See Farm Sanctuary, 212 F.Supp.2d at 282-83.
 
 
 13
 The District Court granted defendants' motion to dismiss by written memorandum and order on July 30, 2002, rejecting Baur's contention that "the increased risk to the food supply created by the threat of BSE contamination" constituted an adequate injury-in-fact for Article III standing purposes.[5] Id. at 283. Noting that "[t]he record provides no evidence of BSE in the United States," the District Court classified Baur's alleged harm as too "remote" and "hypothetical" to support standing. Id. at 283-84. In dismissing Baur's complaint, the District Court also expressed concern over the potential breadth of Baur's standing claim, noting that if it "were to find that Baur's fear of contracting vCJD constituted a direct injury, then any citizen would have standing to sue to direct the federal government to take an action to improve health, occupational, or environmental safety" — impermissibly blurring the proper distinctions between legislative and judicial oversight of agency action. Id. at 284.
 
 
 14
 Judgment was entered on August 5, 2002, and this timely appeal followed.
 
 DISCUSSION
 
 15
 We review the District Court's dismissal of Baur's complaint for lack of standing de novo, accepting as true all of the complaint's material allegations and construing the complaint in Baur's favor. See Excimer Assocs. v. LCA Vision, Inc., 292 F.3d 134, 139 (2d Cir.2002) (per curiam) (citing Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Although standing is a fundamental jurisdictional requirement, it is still subject to the same degree of proof that governs other contested factual issues. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Thus, at the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury. See id. (recognizing that "[a]t the pleading stage, general factual allegations of injury ... may suffice [to establish standing], for on a motion to dismiss we `presum[e] that general allegations embrace those specific facts that are necessary to support the claim'") (quoting Lujan v. National Wildlife Fed'n, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) (alteration in original). It bears emphasis that under federal pleading rules, "[c]omplaints need not be elaborate, and in this respect injury (and thus standing) is no different from any other matter that may be alleged generally." See South Austin Coalition Comm. v. SBC Communications, 274 F.3d 1168, 1171 (7th Cir.2001).
 
 A. Article III Standing and Injury-In-Fact
 
 16
 On appeal, the parties frame a narrow question for us to consider: whether Baur's allegation that he faces an increased risk of contracting a food-borne illness from the consumption of downed livestock constitutes a cognizable injury-in-fact for Article III standing purposes. The underlying law that governs this inquiry is well-established. Article III, § 2 of the United States Constitution restricts federal courts to deciding "Cases" and "Controversies" and thus imposes what the Supreme Court has described as the "irreducible constitutional minimum of standing," — injury-in-fact, causation, and redressibility. Lujan, 504 U.S. at 560, 112 S.Ct. 2130. To establish Article III standing, a plaintiff must therefore allege, and ultimately prove, that he has suffered an injury-in-fact that is fairly traceable to the challenged action of the defendant, and which is likely to be redressed by the requested relief. See Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997). These core requirements are designed to ensure that the exercise of federal jurisdiction is consistent with separation of powers, limiting federal jurisdiction to those suits "traditionally thought to be capable of resolution through the judicial process." Valley Forge Christian College v. Americans United for Separation of Church & State, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (quoting Flast v. Cohen, 392 U.S. 83, 97, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968)).
 
 
 17
 In this case, only the injury-in-fact requirement of Article III standing is at issue.[6] To qualify as a constitutionally sufficient injury-in-fact, the asserted injury must be "concrete and particularized" as well as "actual or imminent, not `conjectural' or `hypothetical.'" Lujan, 504 U.S. at 560, 112 S.Ct. 2130. Because "[t]he standing inquiry focuses on whether the plaintiff is the proper party to bring ... suit," the injury analysis "often turns on the nature and source of the claim asserted." Raines v. Byrd, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Moreover, the assessment of injury is functionally tied to the separation of powers and judicial competence concerns underlying the standing doctrine. See Valley Forge, 454 U.S. at 471-72, 102 S.Ct. 752. Thus, in evaluating whether the alleged injury is concrete and particularized, we assess whether the injury "affect[s] the plaintiff in a personal and individual way," see Lujan, 504 U.S. at 560 n. 1, 112 S.Ct. 2130, to confirm that the plaintiff has a personal stake in the controversy and avoid having the federal courts serve as "merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding," Valley Forge, 454 U.S. at 473, 102 S.Ct. 752. Likewise, the requirement of concrete injury recognizes that if an injury is too abstract, the plaintiff's claim may not be capable of, or otherwise suitable for, judicial resolution. See Raines, 521 U.S. at 819, 117 S.Ct. 2312. Similarly, to support standing, the plaintiff's injury must be actual or imminent to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur. See Lujan, 504 U.S. at 564-65 n. 2, 112 S.Ct. 2130 (noting that "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is certainly impending") (internal quotation marks omitted).
 
 
 18
 B. Enhanced Risk as Injury in Food and Drug Safety Suits
 
 
 19
 Here, the government largely concedes, at least for the purposes of this type of administrative action, that relevant injury-in-fact may be the increased risk of disease transmission caused by exposure to a potentially dangerous food product. Thus, the heart of the standing dispute in this case lies not in the notion that risk may qualify as injury-in-fact, but instead in whether Baur has succeeded in alleging more than a merely speculative risk of disease transmission from downed livestock. Nonetheless, because we have an independent obligation to address standing issues, see Thompson v. County of Franklin, 15 F.3d 245, 248-49 (2d Cir.1994), we explain the reasons why an enhanced risk of disease transmission may constitute injury-in-fact.
 
 
 20
 Although the Supreme Court has yet to speak directly on this issue,[7] the courts of appeals have generally recognized that threatened harm in the form of an increased risk of future injury may serve as injury-in-fact for Article III standing purposes. See Friends of the Earth, Inc. v. Gaston Copper Recycling, Corp., 204 F.3d 149, 160 (4th Cir.2000) (en banc) (concluding that "[t]hreats or increased risk constitutes cognizable harm" sufficient to meet the injury-in-fact requirement); Central Delta Water Agency v. United States, 306 F.3d 938, 947-48 (9th Cir.2002) (holding that "the possibility of future injury may be sufficient to confer standing on plaintiffs" and concluding that plaintiffs could proceed with their suit where they "raised a material question of fact ... [as to] whether they will suffer a substantial risk of harm as a result of [the government's] policies"); Johnson v. Allsteel, Inc., 259 F.3d 885, 888 (7th Cir.2001) (holding that the "increased risk that a plan participant faces" as a result of an ERISA plan administrator's increase in discretionary authority satisfies Article III injury-in-fact requirements); Walters v. Edgar, 163 F.3d 430, 434 (7th Cir.1998) (reasoning that "[a] probabilistic harm, if nontrivial, can support standing"), cert. denied, 526 U.S. 1146, 119 S.Ct. 2022, 143 L.Ed.2d 1033 (1999); Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1234-35 (D.C.Cir.1996) (recognizing that an incremental increase in the risk of forest fires caused by the Forest Service's action satisfied Article III standing requirements).
 
 
 21
 We have also recognized similar types of standing claims. For example, in deciding a suit under the Clean Air Act, this Court recently determined that the likelihood of exposure to additional sulfur dioxide emissions, even where the emissions will not exceed government air quality standards, qualifies as an injury-in-fact sufficient to confer standing. See LaFleur v. Whitman, 300 F.3d 256, 270 (2d Cir.2002). We have also held that where plaintiffs reside in close proximity to sources of air pollution, "uncertainty" as to the health effects of such pollution constitutes cognizable injury-in-fact. See N.Y. Pub. Interest Research Group v. Whitman, 321 F.3d 316, 325-26 (2d Cir.2002).
 
 
 22
 In this case, we need not decide as a matter of law whether enhanced risk generally qualifies as sufficient injury to confer standing, nor do we purport to imply that we would adopt such a broad view. In the specific context of food and drug safety suits, however, we conclude that such injuries are cognizable for standing purposes, where the plaintiff alleges exposure to potentially harmful products. See, e.g., Public Citizen v. Foreman, 631 F.2d 969, 974 n. 12 (D.C.Cir.1980) (concluding that plaintiffs had standing to seek a declaratory judgment that nitrates are an unsafe food additive where they alleged that nitrate-free bacon was not readily available at a reasonable price); Stauber v. Shalala, 895 F.Supp. 1178, 1187-88 (W.D.Wis.1995) (reasoning that where the purpose of the statute is to eliminate uncertainty as to health risks, the "increased risk of potential harm that the consumer must bear is an injury in fact for standing purposes" and holding that plaintiffs demonstrated standing where they alleged "exposure to a potentially dangerous drug whose safety has not been demonstrated in accordance with the [FFDCA]"); Cutler v. Kennedy, 475 F.Supp. 838, 848-50 (D.D.C. 1979) (reasoning that exposure to drugs that had allegedly been approved without adequate FDA testing was sufficient to support standing given the resulting risk of harm), overruled on other grounds in Chaney v. Heckler, 718 F.2d 1174, 1188 n. 35 (D.C.Cir.1983).[8]
 
 
 23
 Although this type of injury has been most commonly recognized in environmental cases, the reasons for treating enhanced risk as sufficient injury-in-fact in the environmental context extend by analogy to consumer food and drug safety suits. Like threatened environmental harm, the potential harm from exposure to dangerous food products or drugs "is by nature probabilistic," yet an unreasonable exposure to risk may itself cause cognizable injury. Gaston Copper, 204 F.3d at 160. Significantly, the very purpose of the FMIA and the FFDCA, the statutes which Baur alleges the USDA has violated, is to ensure the safety of the nation's food supply and to minimize the risk to public health from potentially dangerous food and drug products. See 21 U.S.C. § 602 (stating that "[i]t is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged"); 62 Cases, More or Less, Each Containing Six Jars of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 95 L.Ed. 566 (1951) (the purpose of the FFDCA is to protect public health by keeping impure and adulterated food from the channels of commerce).
 
 
 24
 Thus, in this case, there is a tight connection between the type of injury which Baur alleges and the fundamental goals of the statutes which he sues under — reinforcing Baur's claim of cognizable injury. See Gaston Copper, 204 F.3d at 156 (affirming plaintiff's standing to sue where the plaintiff "alleged precisely [those] types of injuries that Congress intended to prevent by enacting the Clean Water Act"); Cutler, 475 F.Supp. at 848-49 (recognizing that "[p]laintiffs' claim of injury must be considered in the context of the comprehensive regulatory scheme created by the FFDCA," and concluding that plaintiffs' alleged exposure to drugs marketed in violation of the statute "constitutes a distinct and palpable injury to plaintiffs' statutory interests as drug consumers"); see also Cass R. Sunstein, Standing Injuries, 1993 SUP. CT. REV. 37, 58 (1994) (reasoning that where the very purpose of the regulatory statute is risk minimization, it should be presumed that plaintiffs "should be allowed to bring suit to prevent the sorts of injuries that the regulatory scheme was designed to prevent... to ensure that the agencies adhere to the will of Congress"); Jerry L. Mashaw, "Rights" in the Federal Administrative State, 92 YALE L.J. 1129, 1168 (1983) (noting that some Supreme Court precedent "suggest[s] that increased risk will satisfy the requirement of injury in fact, at least where the statutory scheme that gives rise to the complaint is itself essentially concerned with restructuring risks").
 
 
 25
 It may well be that recognizing enhanced risk as a type of cognizable injury in consumer safety suits would suggest that any citizen could have standing to challenge government safety regulations, a concern which the District Court cited in dismissing Baur's suit. See Farm Sanctuary, 212 F.Supp.2d at 284. However, "standing is not to be denied simply because many people suffer the same injury." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); see also Sierra Club v. Morton, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ("[T]he fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process."). As the Supreme Court recently explained in Fed. Election Comm'n v. Akins, 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), injury-in-fact may be found although the asserted harm is "widely shared" if the harm is sufficiently concrete and particularized. Here, there is no question that Baur alleges a discrete, individual risk of personal harm from exposure to contaminated beef and bases his claim of standing on more than a generalized concern that the government obey the law.[9] And while Baur could certainly seek redress through the political process, as recommended by the District Court, see Farm Sanctuary, 212 F.Supp.2d at 284, "the fact that a political forum may be more readily available where an injury is widely shared ... does not, by itself, automatically disqualify an interest for Article III purposes." Akins, 524 U.S. at 24, 118 S.Ct. 1777.
 
 
 26
 Finally, although this case is concerned with constitutional standing requirements, there are other overlapping jurisdictional doctrines that "cluster about Article III" which address related concerns. Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (quoting Vander Jagt v. O'Neill, 699 F.2d 1166, 1178-79 (Bork, J., concurring)). Despite the potential expansiveness of recognizing exposure to enhanced risk as injury-in-fact, the constitutional standing requirements of causation and redressibility as well as the related doctrines of prudential standing, mootness, and ripeness all serve to effectively narrow the types of cases which may be adjudicated. See generally id. at 750-51, 104 S.Ct. 3315. Indeed, precisely because Article III injury-in-fact is such "an elastic concept, capable of encompassing nearly all who are effected in some way by an agency action," the Supreme Court has interpreted § 10(a) of the APA, 5 U.S.C. § 702, as imposing a "a further limitation on access to a judicial forum — the zone of interests test." Am. Fed'n of Gov't Employees, Local 2119 v. Cohen, 171 F.3d 460, 468 (7th Cir.1999). The zone of interests test is "a prudential standing requirement," Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co., 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998) that ensures that the injury asserted by a plaintiff challenging regulatory action "falls within the `zone-of-interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint," Lujan, 497 U.S. at 883, 110 S.Ct. 3177, further limiting the scope of potential citizen suits that may be brought under the APA. While we share the District Court's and dissent's concerns about overly broad claims of standing and lawsuits that assert no more than "generalized grievances," it does not follow that Article III injury-in-fact must serve as the sole mechanism for deciding whether particular claims are judicially cognizable. In sum, to honor separation of powers principles, we need not enshrine, as a matter of constitutional principle, barriers to suit that may be addressed through other, potentially more flexible limitations on federal jurisdiction.[10]
 
 C. Credible Threat of Harm
 
 27
 Although we conclude that Baur has asserted a type of injury — exposure to potentially unsafe food products — that is cognizable under Article III, this threshold determination does not end the standing inquiry. The burden of establishing standing lies squarely with Baur, see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000), and to satisfy that burden Baur must allege that he faces a direct risk of harm which rises above mere conjecture. While the standard for reviewing standing at the pleading stage is lenient, a plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing. See, e.g., Schmier v. United States Court of Appeals for the Ninth Cir., 279 F.3d 817, 820 (9th Cir.2001). Given the potentially expansive and nebulous nature of enhanced risk claims, we agree that plaintiffs like Baur must allege a "credible threat of harm" to establish injury-in-fact based on exposure to enhanced risk. See Central Delta Water Agency, 306 F.3d at 950.
 
 
 28
 In evaluating the degree of risk sufficient to support standing, however, we are mindful that "Supreme Court precedent teaches us that the injury in fact requirement ... is qualitative, not quantitative, in nature." Ass'n of Cmty. Orgs. for Reform Now v. Fowler, 178 F.3d 350, 357-58 (5th Cir.1999). Moreover, like the other aspects of standing, the injury-in-fact analysis is highly case-specific, see New Hampshire Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir.1996), and the risk of harm necessary to support standing cannot be defined according to a universal standard. Lujan, 504 U.S. at 564 n. 2, 112 S.Ct. 2130. Because the evaluation of risk is qualitative, the probability of harm which a plaintiff must demonstrate in order to allege a cognizable injury-in-fact logically varies with the severity of the probable harm. See Mountain States Legal Found., 92 F.3d at 1234 (stating that "[t]he more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing"). In this case, Baur alleges that downed cattle may transmit vCJD, a deadly disease with no known cure or treatment. Thus, even a moderate increase in the risk of disease may be sufficient to confer standing.
 
 
 29
 Moreover, there are two critical factors that weigh in favor of concluding that standing exists in this case: (1) the fact that government studies and statements confirm several of Baur's key allegations, see Central Delta Water Agency, 306 F.3d at 950 (concluding that plaintiffs successfully alleged a credible threat of future injury based, in part, on the defendant agency's own estimate that salinity standards would be violated under its proposed operational plan), and (2) that Baur's alleged risk of harm arises from an established government policy. Cf. 31 Foster Children v. Bush, 329 F.3d 1255, 1265-66 (11th Cir.) (recognizing that "when the threatened acts that will cause injury are authorized or part of a[n] [established government] policy, it is significantly more likely that the injury will occur"), cert. denied sub nom. Reggie v. Bush, ___ U.S. ___, 124 S.Ct. 483, 157 L.Ed.2d 376 (2003); Deshawn E. v. Safir, 156 F.3d 340, 344-45 (2d Cir.1998) (concluding that there was an increased likelihood of injury where the challenged interrogation methods were authorized by "officially endorsed policies").
 
 
 30
 (1) Government Confirmation
 
 
 31
 Based on Baur's complaint and the accompanying materials submitted by the parties, we believe that Baur has successfully alleged a credible threat of harm from downed cattle.[11] Significantly, the USDA itself as well as other government agencies have recognized that downed cattle are especially susceptible to BSE infection. See, e.g., Food Safety and Inspection Service, Current Thinking on Measures that Could be Implemented to Minimize Human Exposure to Materials that Could Potentially Contain the Bovine Spongiform Encephalopathy Agent (2002), available at http://www.fsis.usda.gov/OA/topics/BSE_thinking.htm (hereinafter "FSIS Think Paper") (acknowledging that downed cattle are among the cattle most likely to be infected with BSE); Risk Reduction Strategies for Potential BSE Pathways Involving Downer Cattle and Dead Stock of Cattle and Other Species, 68 Fed. Reg. 2703, 2703-04 (Jan. 21, 2003) (hereinafter "USDA Proposed Rulemaking") (noting that surveillance data from Europe indicates that BSE is present in a higher percentage in nonambulatory livestock and recognizing that "[b]y their nature, downer animals and dead stock include many animals dead or dying from communicable diseases [and] ... [t]herefore represent a significant pathway for spread of disease if they are not handled or disposed of with appropriate safeguards").[12]
 
 
 32
 The USDA acknowledges that since BSE was first detected in the United Kingdom in 1986, the disease has spread to over twenty-three countries and that presently over 180,000 cases of BSE have been detected worldwide. In addition, over one hundred people have died after contracting vCJD, and some experts predict that the mortality rates from vCJD could exceed one hundred thousand in the UK alone. In response to this threat, the USDA has imposed various import controls and adopted a feed ban prohibiting the use of most animal-derived proteins in cattle feed. The USDA has also adopted a surveillance program which "consists primarily of collecting and analyzing brain samples from adult cattle with neurological symptoms and adult animals that were non-ambulatory at slaughter." Because FSIS has determined that downed animals are at particular risk for neurological illnesses such as BSE, it has focused its testing efforts on downed cattle which currently account for over 90% of the animals tested in the federal BSE surveillance program.
 
 
 33
 Pointing to these regulatory safeguards as well as the results of a study by the Harvard Center for Risk Analysis, see United States Department of Agriculture, Evaluation of the Potential for Bovine Spongiform Encephalopathy in the United States (2001), available at, http://www.aphis.usda.gov/lpa/issues/bse/bse-riskassmt.html (hereinafter "Harvard Study"), defendants argue that there is no evidence that BSE is currently present in the United States or is ever likely to enter this country. The Harvard Study concluded that the United States "is highly resistant to any introduction of BSE or a similar disease," and that given current regulations, it would be "extremely unlikely" that BSE would become established even if the disease were to enter this country. Id. at i. While the Harvard Study may ultimately be persuasive, Baur has not yet been afforded an opportunity to dispute its results. Baur alleges that a form of BSE may already be present in the United States and that current inspection procedures may fail to detect cases of BSE-infection in downed cattle, an allegation which receives some support from government reports. For example, FSIS has previously acknowledged that "the typical clinical signs associated with BSE cannot always be observed in downer cattle infected with BSE. Thus, if BSE were present in the U.S., downer cattle infected with BSE could potentially be offered for slaughter and, if the clinical signs of the disease were not detected, pass ante-mortem inspection. These cattle could then be slaughtered for human food." FSIS Think Paper at 9; see also USDA Proposed Rulemaking at 2706 (noting that "because the signs of BSE often cannot be differentiated from the signs of many other diseases and conditions affecting downer cattle," BSE-infected animals may pass inspection and be offered for human consumption). Moreover, a January 2002 report by the General Accounting Office may call the Harvard Study into doubt by raising concerns about the effectiveness of current federal BSE prevention and detection efforts. See United States General Accounting Office, Rep. No. GAO-02-183, Mad Cow Disease: Improvements in the Animal Feed Ban and Other Regulatory Areas Would Strengthen U.S. Prevention Efforts (2002) (hereinafter "GAO Report") (noting that "[w]hile BSE has not been found in the United States, federal actions do not sufficiently ensure that all BSE-infected animals or products are kept out or that if BSE were found, it would be detected promptly and not spread to other cattle through animal feed or enter the human food supply").
 
 
 34
 Critically, while it is undisputed that BSE has not been detected in the United States despite over ten years of government surveillance, the significance of this fact in evaluating the present risk from the disease is vigorously contested by the parties. Cf. Central Delta Water Agency, 306 F.3d at 950 (noting that "a standing determination should not be based only on statistical probabilities if other specific circumstances render the threat of injury more or less likely than the statistics might otherwise suggest"). In support of his claim, Baur has pointed to the inherent limitations in current BSE testing capabilities, suggesting that current screening procedures may fail to detect current cases of BSE among downed cattle. Indeed, FSIS has itself noted that there are no reliable tests for detecting BSE in a live animal and that the:
 
 
 35
 [A]vailable post mortem diagnostic tests can only indicate that cattle have the disease two to three months prior to the onset of clinical disease or after the onset of clinical disease. Thus, given the limitations of the diagnostics available today, certain tissues of cattle infected with BSE may contain the BSE agent before a diagnostic test could indicate that the animal has BSE ... [with the result that] exempting cattle that have tested negative for BSE ... would not provide the same level of protection against potential human exposure to the BSE agent as would removing those materials for use as, or in the production of, human food.[13]
 
 
 36
 FSIS Think Paper at 10.
 
 
 37
 In light of these questions over the presence of BSE in the United States and the adequacy of current testing and detection abilities, we do not agree that Baur's standing rests solely on his ability to allege that BSE has been found in the United States. Significantly, government reports confirm some of the risk factors that Baur has cited, and government agencies have already taken preemptive steps to minimize human exposure to BSE without waiting for definitive evidence that BSE has entered the country, strongly suggesting that they view the potential health risks from BSE as both serious and imminent. See, e.g., FSIS Think Paper at 1 (noting that "the FSIS is considering implementing a number of measures to minimize human exposure to materials that could potentially contain" BSE); GAO Report at 28 (stating that the FDA's TSE Advisory Committee has recommended that the "FDA consider taking regulatory action to ban brains and other central nervous system tissue from human food because of the potential risk of exposure to BSE-infected tissue").
 
 
 38
 (2) Risk Attributable to a Specific Government Policy
 
 
 39
 In addition, the risk of disease transmission which Baur alleges arises directly from the USDA's regulatory policy of permitting the use of downed cattle for human consumption. In concluding that "Baur's harm is more appropriately classified as hypothetical rather than imminent," the District Court relied on City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) and Northwest Airlines, Inc. v. Fed. Aviation Admin., 795 F.2d 195 (D.C.Cir.1986). However, in both Lyons and Northwest Airlines the occurrence of the alleged future injury rested on the independent actions of third-parties not before the court, rendering the asserted injury too speculative for standing purposes. See Lyons, 461 U.S. at 106, 103 S.Ct. 1660 (to find a credible threat of future harm, the Court would have to assume that police officers would again subject plaintiff to a chokehold during the course of routine traffic stop without any justifiable provocation);[14] Northwest Airlines, 795 F.2d at 201 (concluding that the alleged safety risk caused by the FAA's recertification of a airplane pilot, previously suspended for flying while intoxicated, was too speculative to support standing where there was no allegation that any other airline had hired the suspended pilot and no indication that the pilot would ever fly in the same areas as the plaintiff airline).
 
 
 40
 While the dissent argues that the standing inquiry must be guided by Lyons, we do not believe that Lyons controls, as this case is not solely about future injury. Reading the complaint in Baur's favor, Baur has alleged that: (1) a form of BSE may already be present in the United States, (2) available testing methods do not adequately detect BSE in downed cattle, and (3) under the USDA's current regulations, infected beef from downed cattle can enter the food stream. If Baur's allegations are to be credited, as they must be at the pleading stage, then Baur faces a present, immediate risk of exposure to BSE as a consumer of beef products — not a future risk that awaits intervening events. This present exposure to a credible threat of harm constitutes the relevant injury in fact for Article III purposes. Unlike in Lyons, or other similar Supreme Court cases where standing was found wanting because the threatened injury was wholly contingent on independent and unpredictable events that did not stem from an established government policy, see generally Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (discussing prior precedents), this is not a case where "no amount of evidence" could possibly establish the existence of a "real and immediate" risk. Id. at 160, 110 S.Ct. 1717.
 
 
 41
 Although a chain of contingencies may need to occur for Baur to actually contract vCJD as a result of his exposure to contaminated beef, to sustain standing, it is not the materialization of the feared risk itself that must be "certainly impending." Lujan, 504 U.S. at 564-65 n. 2, 112 S.Ct. 2130. Such a narrow rule would effectively bar standing in any case where the threatened medical injury has a complex etiology or delayed manifestation. And as we have clarified, the relevant "injury" for standing purposes may be exposure to a sufficiently serious risk of medical harm — not the anticipated medical harm itself — thus only the exposure must be imminent, not the actual onset of disease. Nor do we agree, as the dissent concludes, that Article III injury-in-fact can only be found if there is an imminent likelihood that Baur will actually consume contaminated meat, a risk that would concededly be speculative even if BSE had already been detected in substantial numbers of downed cattle in the United States. Under the dissent's reasoning most food and drug safety suits involving potential contamination or adulteration would simply not be judicially cognizable — and Congress would lack the power to permit such suits, see Bennett, 520 U.S. at 162, 117 S.Ct. 1154 (noting that Congress does not have the authority to modify or abrogate constitutional standing requirements) — because the chance that any particular plaintiff will consume the contaminated product will likely be exceedingly remote. Indeed, under the dissent's analysis, even if the USDA completely stopped enforcing its current import restrictions and BSE inspection programs, no consumer would have standing to sue, as it would remain purely speculative that any individual consumer would actually consume contaminated beef and contract vCJD as a result.
 
 
 42
 D. Evaluation of Standing at the Pleading Stage
 
 
 43
 Given the allegations in Baur's complaint and the supporting materials submitted by the parties, we believe that Baur has adequately alleged a credible threat of harm from downed cattle,[15] and because this case remains at the pleading stage, no more is required. To survive a motion to dismiss, Baur need not present more specific scientific evidence or statistical verification to prove that the risk actually exists. See, e.g., Bennett v. Spear, 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (noting that at the pleading stage, standing will be upheld where a plaintiff provides some support for his claim of standing and it is possible to "presume facts under which [the plaintiff] will be injured"); Alliant Energy Corp. v. Bie, 277 F.3d 916, 920 (7th Cir.2002) (reasoning that where "[i]t is easy to imagine facts consistent with [the] complaint and affidavits that will show plaintiffs' standing ... no more is required" to establish standing at the pleading stage) (emphasis in original). The dissent points out that in other cases where standing has been upheld on an enhanced risk theory, the plaintiffs presented specific statistical evidence of enhanced risk. However, each of these cases was decided at a later procedural stage where plaintiffs can properly be expected to present a full factual record to meet their burden of establishing standing. See Central Delta Water Agency, 306 F.3d at 946 (standing decided at summary judgment stage); Gaston Copper, 204 F.3d at 153 (standing decided after a six-day bench trial); Mountain States Legal Foundation, 92 F.3d at 1232 (standing decided at summary judgment stage).
 
 
 44
 Moreover, "[t]o the degree that defendants challenge the factual underpinnings" of Baur's standing "the argument is premature." Fair Hous. in Huntington Comm., Inc. v. Town of Huntington, 316 F.3d 357, 361 (2d Cir.2003). Defendants may certainly test Baur's standing as the litigation progresses by requesting an evidentiary hearing or by challenging Baur's standing on summary judgment or even at trial. See id. at 361-62; In re: Bennett Funding Group, Inc., 336 F.3d 94, 102 (2d Cir.2003). However, allegation of a credible risk may be sufficient at the pleading stage without further factual confirmation or quantification of the precise risk at issue. Adopting a more stringent view of the injury-in-fact requirement in environmental cases and food and drug safety suits would essentially collapse the standing inquiry into the merits. Cf. Wooden v. Bd. of Regents of the Univ. Sys. of Ga., 247 F.3d 1262, 1280 (11th Cir.2001) (finding defendants' argument that plaintiff suffered no injury-in-fact "unconvincing because, at bottom, it conceives of the standing inquiry as duplicating an inquiry into the merits").
 
 
 45
 It may well be that Baur has little chance of success on his administrative claim if defendants are ultimately correct that BSE has not yet entered the United States. Nonetheless, Article III standing requirements are not intended as a screen for potentially frivolous lawsuits, for there is certainly no independent constitutional barrier to the federal courts entertaining unsuccessful claims. See Alliant Energy, 277 F.3d at 920 (emphasizing that "[s]kepticism about a plaintiff's ability to prove [his] claims is not a reason to dismiss a pleading ... it is at most a reason to hold a hearing [on the question of standing] and require the plaintiff to pony up the proof"); cf. Wooden, 247 F.3d at 1280 n. 16 (noting that while "some overlap may be inevitable, standing doctrine was not intended to provide a vehicle for resolution ... of fundamentally merits issues" at the threshold of litigation). Because the degree of risk posed by allowing the use of downed livestock for human consumption lies at the core of Baur's administrative claim, we are reluctant to adopt an interpretation of the injury-in-fact requirement that would conflate standing with an evaluation of the underlying soundness of the USDA's action. For example, it is unclear what statistical showing the dissent would deem sufficient to establish standing in this case. Would a 0.00011% chance of exposure to BSE contaminated beef be sufficient to demonstrate sufficient injury, or would the risk of exposure be too minuscule to merit standing? In our view, the evaluation of the amount of tolerable risk is better analyzed as an administrative decision governed by the relevant statutes rather than a constitutional question governed by Article III.
 
 CONCLUSION
 
 46
 While we acknowledge the valid concerns cited by the District Court and dissent in questioning Baur's standing to bring suit, we believe that the Article III inquiry must be shaped by the nature of the plaintiff's claims and the procedural posture of the case. Fundamentally, "standing simply means that the plaintiff is entitled to `walk through the courthouse door' and raise his grievance before a federal court," Wooden, 247 F.3d at 1280, and we conclude that Baur's allegations are sufficient at the pleading stage to give him that opportunity.
 
 
 47
 For the reasons stated above, we VACATE the judgment of the District Court as to Baur and remand for further proceedings consistent with this opinion, including a determination as to whether Baur has standing to challenge the defendants' action with regard to downed livestock other than cattle.
 
 
 
 Notes:
 
 
 *
 The Honorable David N. Hurd, Judge of the United States District Court for the Northern District of New York, sitting by designation
 
 
 [1]
 Other animal TSEs include transmissible mink encephalopathy, feline spongiform encephalopathy, chronic wasting disease in deer and elk, and scrapie in sheep and goats. TSEs that affect humans include kuru, classic Creutzfeldt Jakob disease, variant Creutzfeldt Jakob disease, Gerstmann-Straussler-Scheinker syndrome, and fatal familial insomnia
 
 
 [2]
 The FFDCA prohibits the manufacture, delivery, receipt, or introduction of adulterated food into interstate commerceSee 21 U.S.C. § 331.
 
 
 [3]
 While the authors of the study acknowledged that "[s]o far, there is no evidence for the secondary transmission of BSE from [] resistant species to more susceptible species," they noted that "the results presented [in this study] would strongly favour a decision to stop feeding ruminant-derived products to all animal species. Additional experiments should be carried out to detect possible BSE infectivity in clinically normal BSE-exposed animal species."
 
 
 [4]
 Currently, the USDA classifies all downed livestock presented for slaughter as "U.S Suspects."See 9 C.F.R. § 301.2 (2003) (defining U.S. Suspects as livestock "suspected of being affected with a disease or condition which may require condemnation in whole or in part, when slaughtered, and [which] is subject to further examination by an inspector to determine its disposal"); 9 C.F.R. § 309.2(b) (2003) (providing that "[a]ll seriously crippled animals and animals commonly termed `downers,' shall be identified as U.S. Suspects"). If upon inspection the downed animal shows signs of certain diseases, it is condemned and disposed of according to specified procedures. See 9 C.F.R. §§ 309.4-309.15 (2003). However, if the downed animal passes postmortem inspection by a veterinary officer, it may be passed in whole or in part for human food. See generally 9 C.F.R. § 311.1 (2003).
 
 
 [5]
 Farm Sanctuary, Inc., ("Farm Sanctuary"), a non-profit organization dedicated to the promotion of humane food production practices, joined in the administrative petitions below and served as co-plaintiff in the eventual suit before the District Court. The District Court dismissed Farm Sanctuary's claims for failure to meet the zone of interests test for prudential standingSee Farm Sanctuary, 212 F.Supp.2d at 284-85 (noting that "Farm Sanctuary's [asserted] injury, that its members are harmed when they observe the treatment of animals at slaughterhouses, is beyond the scope of the FMIA"). Because Farm Sanctuary does not appeal this judgment, we focus solely on the allegations raised by Baur.
 
 
 [6]
 The government does not contest causation and redressibility, and it seems clear that if the alleged risk of disease transmission from downed livestock qualifies as a cognizable injury-in-fact then Baur's injury is fairly traceable to the USDA's decision to permit the use of such livestock for human consumption and could be redressed if the court granted Baur's request for equitable relief
 
 
 [7]
 Without questioning standing, the Supreme Court has decided cases in which it appeared to assume that enhanced risk may cause real injurySee, e.g., Helling v. McKinney, 509 U.S. 25, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (concluding that a prisoner could bring an Eighth Amendment claim for injunctive relief based on allegations that prison officials had exposed him "to levels of [second-hand smoke] that pose an unreasonable risk of serious damage to his future health"); Metro-North Commuter R.R. Co. v. Buckley, 521 U.S. 424, 434-36, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (noting that exposure to known carcinogens may reasonably cause distress but holding for various policy reasons that a plaintiff cannot recover emotional distress damages under the Federal Employers' Liability Act until the manifestation of disease symptoms).
 Because these cases did not specifically address the issue of standing, they do not provide direct precedential authority for finding standing in this case. See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 91, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); Lewis v. Casey, 518 U.S. 343, 352 n. 2, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). However, the Supreme Court's analysis in both Helling and Metro-North displays a willingness, at least under some circumstances, to conceptualize exposure to enhanced risk as a type of cognizable injury. See Helling, 509 U.S. at 33, 113 S.Ct. 2475 (reasoning that a prisoner can seek injunctive relief from exposure to an unreasonable risk of future harm, such as exposure to an infectious disease, without alleging "that the likely harm [will] occur immediately and ... [al]though the possible infection might not affect all of those exposed").
 
 
 [8]
 The District Court distinguished this line of precedent for recognizing enhanced risk as a basis for standing in food and drug suits, because in the prior cases, "the contaminated or untested product was actually on the market," establishing the plaintiff's exposure to the allegedly harmful productFarm Sanctuary, 212 F.Supp.2d at 283. This case admittedly presents a different factual scenario: while there is no dispute as to the potential danger of BSE, defendants claim that Baur's risk of exposure is purely speculative. However, we can discern no reason to distinguish between uncontested exposure to a potentially harmful substance and potential exposure to an undisputedly dangerous contaminant for standing purposes. In both types of cases, standing should rest on all of relevant facts underlying the plaintiff's claim, not on the happenstance of which particular facts happen to be in dispute.
 
 
 [9]
 The dissent concludes that Baur has asserted no more than a generalized grievance, because Baur cannot distinguish himself from the millions of other Americans who regularly consume beef. But if a concrete harm is "widely shared" there is no additional requirement that a plaintiff demonstrate enhanced susceptibility to establish constitutional standing. The fact that many other citizens could assert the same injury, by itself, is not sufficient to defeat standingSee Akins, 524 U.S. at 23-24, 118 S.Ct. 1777 (concluding that plaintiffs' inability to obtain information about a political organization qualified as Article III injury-in-fact, although injury was potentially shared by many other citizens); see also Pye v. United States, 269 F.3d 459, 469 (4th Cir.2001) (noting that "[s]o long as the plaintiff himself has a concrete and particularized injury, it does not matter that legions of other persons have the same injury").
 
 
 [10]
 Indeed, the great virtue of the zone of interests test may be its inherent flexibilitySee Bennett v. Spear, 520 U.S. 154, 163, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (recognizing that "that the breadth of the zone of interests varies according to the provisions of law at issue, so that what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the generous review provisions of the APA may not do so for other purposes").
 
 
 [11]
 Some of the materials submitted by the parties post-date Baur's complaint. Although a plaintiff's standing is "assessed as of the time the lawsuit is brought,"Comer v. Cisneros, 37 F.3d 775, 787 (2d Cir.1994), post-filing events may confirm that a plaintiff's fear of future harm is reasonable. See, e.g., Hargrave, Vermont Prot. & Advocacy, Inc. v. Vermont, 340 F.3d 27, 34 (2d Cir.2003).
 
 
 [12]
 Prior to argument, we asked the parties to submit letter-briefs addressing the potential impact of the proposed rulemaking on Baur's standing and related jurisdictional issuesSee City of Charleston v. A Fisherman's Best, Inc., 310 F.3d 155, 172 (4th Cir.2002) (acknowledging that the court of appeals may take judicial notice of a proposed rule published in the Federal Register even if the proposed rule was not called to the attention of the trial court).
 
 
 [13]
 Development of such diagnostic testing has been hampered by our "limited scientific understanding of BSE and other TSEs, including when during the incubation period infectivity appears, what mechanism causes infection, and whether infectivity is ever present in blood." GAO Report at 7
 
 
 [14]
 Notably, inLyons, the Supreme Court specifically emphasized that there was no official policy authorizing the use of chokeholds without prior provocation, suggesting that if the plaintiff could make such an "incredible assertion" he could potentially establish standing. Lyons, 461 U.S. at 105-06, 103 S.Ct. 1660. Thus, while the City of Los Angeles was a defendant in the action, the risk of future injury for Lyons himself was solely contingent on "having an encounter with police wherein police would administer an allegedly illegal `chokehol[d].'" Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quoting Lyons, 461 U.S. at 105, 103 S.Ct. 1660) (alteration in the original).
 
 
 [15]
 Although the parties have focused solely on the risk of BSE transmission from downed cattle, a plaintiff must demonstrate standing for each claim and form of relief soughtSee, e.g., Donahue v. City of Boston, 304 F.3d 110, 116 (1st Cir.2002); Clark v. City of Lakewood, 259 F.3d 996, 1006 (9th Cir.2001). In his complaint, Baur seeks wider injunctive and declaratory relief with regard to all downed livestock. To pursue such broad relief, Baur must also demonstrate a credible threat of disease transmission from livestock other than cattle. Cf. Lewis v. United States, 518 U.S. 322, 116 S.Ct. 2163, 135 L.Ed.2d 590 (1996) (noting that standing is necessarily limited to the injury shown; thus a plaintiff who is injured by one administrative deficiency does not necessarily obtain standing to challenge all similar deficiencies).
 Baur does allege that animals other than cattle may be susceptible to BSE. While some of the materials in the record do suggest that other types of livestock may carry dangerous forms of TSE, see, e.g., GAO Report at 52 (stating that "recent research suggests the possibility of `silent' incubation in species not previously thought susceptible to TSEs. This research argues against waiting until BSE is found to strengthen measures shown to prevent the spread of the disease."), we lack adequate information to fully assess Baur's standing as to the broader category of downed livestock, and therefore remand this issue to the District Court for additional consideration. See Fund for Animals v. Babbitt, 89 F.3d 128, 134 (2d Cir.1996) (declining to rule on standing and remanding to the district court where the disputed standing issue "was neither ruled on by the district court nor fully briefed by the parties").
 
 
 POOLER, Circuit Judge, dissenting:
 
 48
 The plaintiff, Michael Baur, challenges the wisdom of current United States Department of Agriculture ("USDA") practices which allow "downed" livestock to enter the nation's food supply. Because I do not believe Baur has met well-established standards of standing to sue, I respectfully dissent.
 
 
 49
 The district court and the majority disagree over the extent to which Baur has established the threat posed to livestock by bovine spongiform encephalopathy ("BSE") and to humans who may contract variant Crutzfeldt-Jacob disease ("vCJD") if they consume the meat of an animal infected with BSE. The district court emphasized that Baur and his co-plaintiff, which does not join him on this appeal, "have provided no evidence that BSE has been detected in the United States, let alone that any BSE-infected meat has actually been sold." The district court declared that this was sufficient to demonstrate that Baur had alleged a "hypothetical rather than imminent" harm, and concluded as a result that he lacked standing to bring this lawsuit.
 
 
 50
 The majority observes, however, that although no case of BSE or vCJD has yet been documented within the United States, Baur has noted the existence of "a recently published study which allegedly raised the possibility that BSE infectivity may persist in animals previously thought to be BSE-resistant. The majority also finds it significant that `the USDA itself as well as other government agencies have recognized that downed cattle are especially susceptible to BSE infection'" and that the USDA "has also adopted a surveillance program" to monitor a potential outbreak of BSE. Concluding on the basis of such evidence that Baur has asserted a threat that is more imminent than hypothetical, the majority finds that Baur does have standing to litigate the adequacy of current USDA policies for preventing BSE.
 
 
 51
 The majority, however, has not made any substantial effort to consider the strength of Baur's allegations that he faces injury from a possible future outbreak of BSE. But adequate allegations of personal injury are an essential element of standing to sue. It is not sufficient that Baur has asserted the plausible existence of an imminent threat to the health and well-being of society at large.
 
 I.
 
 52
 In order to establish "the `irreducible constitutional minimum' of standing, a plaintiff must, generally speaking, demonstrate that he has suffered `injury in fact,' that the injury is `fairly traceable' to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." Bennett v. Spear, 520 U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 471-72, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)). The phrase "injury in fact," is imprecise, but the Supreme Court's "extensive body of case law on standing ... hardly leaves courts at sea in applying the law of standing." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (citation omitted).
 
 
 53
 One element of the Supreme Court's holdings regarding a plaintiff's demonstration of injury in fact is particularly germane to the instant appeal. When a plaintiff is challenging some general policy or practice of a government entity, such as the USDA practices that Baur challenges here, injury in fact is not established by positing injury to someone other than the plaintiff or to society at large. See Friends of the Earth, Inc. V. Laidlaw Environmental Services, Inc., 528 U.S. 167, 181, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (in a lawsuit challenging an environmental regulation, "[t]he relevant showing for purposes of Article III standing ... is not injury to the environment but injury to the plaintiff"). On the contrary, the plaintiff must establish "distinct and palpable injury to himself." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (emphasis added). The Supreme Court held eighty years ago that a plaintiff must establish "that he has sustained or is immediately in danger of sustaining some direct injury as a result of [government policy], and not merely that he suffers in some indefinite way in common with people generally." Valley Forge Christian College, 454 U.S. at 477, 102 S.Ct. 752 (quoting Commonwealth v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923)).
 
 
 54
 Baur's concern for public health is a laudable thing. But a plaintiff's desire to right what he sees as misguided public health policy has no bearing on the question of whether he has established injury in fact. See Vermont Agency of Natural Resources v. Stevens, 529 U.S. 765, 772, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) ("An interest unrelated to injury in fact is insufficient to give a plaintiff standing."). Thus, "standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy." Valley Forge Christian College, 454 U.S. at 486, 102 S.Ct. 752. A showing that the government is engaging in a policy that is wrongheaded, or even callous, "is not a permissible substitute for the showing of injury itself." Id. In short, a plaintiff who wishes to advance the public good by altering government policy should direct his efforts to the political process in particular, and to public discourse in general, for these are the realms where the public good is most directly addressed.[1] By contrast, the federal courts are primarily charged with providing relief for identifiable injuries suffered by parties appearing before them. Stated somewhat brusquely, a plaintiff's desire to effect reform of government policy as to an issue of public concern "does not provide a special license to roam the country in search of governmental wrongdoing and to reveal [his] discoveries in federal court. The federal courts were simply not constituted as ombudsmen of the general welfare." Id. at 487, 102 S.Ct. 752.
 
 
 55
 I acknowledge that "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," for avoiding dismissal on the basis of a lack of standing. Lujan, 504 U.S. at 561, 112 S.Ct. 2130. But "pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action." United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 688-89, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Most especially, the Supreme Court has "consistently stressed that a plaintiff's complaint must establish that he has a `personal stake' in the alleged dispute, and that the alleged injury suffered is particularized as to him." Raines v. Byrd, 521 U.S. 811, 819, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (citations and internal quotations omitted). While Baur may have demonstrated that someone will be harmed as a proximate result of the USCA practices he challenges, he certainly fails to demonstrate that he possesses any quality or characteristic which makes him particularly susceptible to such harm.
 
 
 56
 The problematic nature of Baur's assertion of injury in fact becomes immediately apparent upon reading the complaint. For all purposes relevant to the question of Baur's injury in fact, it contains nothing but the following allegations:
 
 
 57
 6. Plaintiff Michael Baur is an adult individual residing in Riverdale, New York. He is a regular consumer of meat products. Because Mr. Baur regularly eats meat, he is concerned about eating adulterated meat and about the health risks associated with meat from downed animals.
 
 
 58
 * * * * * *
 
 
 59
 28. Mr. Baur is a regular consumer of meat products who is concerned about eating adulterated meat. Since the meat he eats can come from downed animals, each time he eats meat he is at risk of contracting a food-borne illness such as vCJD. Because of the British mad cow epidemic and the recent scientific evidence showing the link between eating meat from BSE-affected animals and the development of vCJD, Mr. Baur is particularly concerned about eating adulterated meat from downed animals.
 
 
 60
 29. As a direct and proximate result of the USDA's failure to label downed livestock as adulterated and to remove adulterated livestock from the food supply, Mr. Baur has been injured by the risk that he may consume meat that is the product of a downed animal, and by his apprehension and concern arising from this risk. Mr. Baur's injuries in this respect would be redressed by the relief requested of this Court. The labeling of all downed animals as adulterated and the subsequent removal of those animals from the nation's food supply would ensure that no meat or meat products consumed by Mr. Baur comes from downed animals.
 
 
 61
 It is clear from this that Baur, like scores of millions of his fellow Americans, eats meat. But how does he distinguish himself from these scores of millions such that a court might conclude that he is particularly susceptible to injury as a result of his meat eating? We are not told whether or not Baur consumes meat in excess of the national per capita average. Rather, we are told that he experiences "apprehension" about his consumption of meat. Since concerns about the health risks of meat consumption are not unknown in contemporary America — they have even been the subject of recent class action litigation in this Circuit, see Pelman v. McDonald's Corp., 237 F.Supp.2d 512 (S.D.N.Y.2003) — this certainly does not make Baur unique among American meat eaters. But let us grant that Baur has succeeded in distinguishing himself as an American meat consumer who is "particularly concerned" about contracting illness as a result of consuming the meat of a BSE-infected animal. Is this, in addition to the fact that he eats meat, sufficient to establish that he has standing to challenge the manner in which the USDA currently approaches the problem of BSE infection?
 
 II.
 
 62
 I believe that this question is best answered by analogy to City of Los Angeles v. Lyons, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). In that case, an individual plaintiff sought to enjoin the police of the City of Los Angeles from the practice of using "chokeholds" to restrain suspects. The plaintiff, who had once been subjected to a chokehold by Los Angeles police officers, alleged in his complaint that he "and others similarly situated are threatened with irreparable injury in the form of bodily injury and loss of life, and that [he] `justifiably fears that any contact he has with Los Angeles Police officers may result in his being choked and strangled to death without provocation, justification or other legal excuse.'" Id. at 98, 103 S.Ct. 1660.
 
 
 63
 The Supreme Court held that the plaintiff failed to demonstrate injury in fact. Even as it acknowledged the possibility that some as yet unidentifiable citizens of Los Angeles might be subjected to chokeholds in the future, and suffer injury as a result, the Court found it to be nothing beyond conjecture that the plaintiff himself would be among these:
 
 
 64
 Of course, it may be that among the countless encounters between the police and the citizens of a great city such as Los Angeles, there will be certain instances in which strangleholds will be illegally applied and injury and death unconstitutionally inflicted on the victim. As we have said, however, it is no more than conjecture to suggest that in every instance of a traffic stop, arrest, or other encounter between the police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse. And it is surely no more than speculation to assert either that Lyons himself will again be involved in one of those unfortunate instances, or that he will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury.
 
 
 65
 Id. at 108, 103 S.Ct. 1660.
 
 
 66
 None of this is to say that the Court did not recognize that the use of force against criminal suspects by the Los Angeles police is a matter of legitimate public concern. But the Court concluded in Lyons that the future course of conduct by Los Angeles police officers was not best fashioned in the context of a lawsuit brought by an individual plaintiff who could do no more than posit the mere possibility that he would be harmed by Los Angeles police officers in the future. Even given that he had been harmed by officers in the past, the Court held that "[a]bsent a sufficient likelihood that he will again be wronged in a similar way, [he] is no more entitled to an injunction than any other citizen of Los Angeles." Id. at 111, 103 S.Ct. 1660.
 
 
 67
 Baur's contentions of injury in fact are much like those asserted by the plaintiff in Lyons, but weaker. The plaintiff in Lyons had suffered past injury as the result of the government policy he challenged in his lawsuit, but Baur makes no allegation that purportedly lax USDA monitoring procedures have already caused him to consume the meat of a BSE-infected animal. Indeed, he does not allege that anyone in the United States has yet consumed BSE-infected meat. Baur does allege that he suffers a form of current injury in that, as he puts it in his brief, "he continually suffers from apprehension and concern that he will contract vCJD and die." As already noted, however, the plaintiff in Lyons also alleged that he suffered as a result of his apprehension and concern that he would be subjected to another chokehold. The Supreme Court squarely rejected this as a basis for establishing injury in fact: "It is the reality of the threat ... that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." Id., at 107, n. 8, 103 S.Ct. 1660 (emphasis in original).
 
 
 68
 This leaves Baur's assertion that he faces potential injury as a result of the alleged failure of the USDA to adequately protect him from consuming BSE-infected meat. While the Supreme Court has held that standing to sue may exist on the part of a plaintiff who attempts to satisfy the injury in fact requirement through allegations of potential injury, the Court has been careful to emphasize that such allegations must rise above the merely conjectural. "A threatened injury must be certainly impending to constitute injury in fact." Whitmore v. Arkansas, 495 U.S. 149, 158, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (quotation omitted). That is, "[w]here there is no actual harm" alleged, "its imminence (though not its precise extent) must be established." Lujan, 504 U.S. at 564, n. 2, 112 S.Ct. 2130. And it is particularly well to repeat here what is noted by the majority; that "[a]lthough `imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." Id.[2]
 
 
 69
 Baur's attempt to establish injury in fact is at least as difficult as that faced by the plaintiff in Lyons. Just as the plaintiff in Lyons was only one citizen of a megalopolis, each one of whom might have an encounter with the police in the future, so Baur is just one among the scores of millions of American meat eaters who might at some point in the future conceivably eat the meat of a BSE-infected animal and become ill. That is, if we consider the future of meat consumption in the United States, we may confidently predict that, to borrow the advertising slogan of a prominent chain of hamburger restaurants, there will be "billions and billions served." Baur has perhaps sufficiently alleged that, among these billions of future servings, current USDA screening procedures will cause some of those being served to become ill because they have eaten the meat of a BSE-infected animal. It is certainly speculative to assert that this will happen, and is doubly speculative to predict how many American meat consumers will be injured should an outbreak of vCJD occur. But it is something well beyond speculation to assert that Baur will be among these unfortunate individuals. I therefore do not understand the majority's conclusion that "if Baur's allegations are to be credited, then he faces a present, immediate risk of exposure to BSE through the consumption of downed livestock." Specifically, I fear that the majority's finding that Baur has established injury in fact allows the requirement of an imminent threat of injury to be satisfied by the merely conceivable.
 
 
 70
 Neither Baur nor the majority make any argument that convinces me that this case is not best analogized to Lyons. The majority attempts to distinguish Lyons by asserting that, in that case, "the occurrence of the alleged future injury rested on the independent actions of third parties not before the court, rendering the asserted injury too speculative for standing purposes." But the institutional entity that could harm the plaintiff in Lyons — the City of Los Angeles — was before the Court, just as the USDA is before this Court. Lyon's injury was speculative because he was only one of the millions of citizens of Los Angeles any one of whom might be harmed in the future by a chokehold, just as Baur's injury is speculative because he is only one of scores of millions of meat eaters any one of whom might eat BSE-infected meat.
 
 
 71
 The majority also asserts that the instant case "is not solely about future injury." Nor was Lyons. There were two components to the injury alleged by the plaintiff in Lyons: the possibility that he would be injured by a chokehold in the future and his present fear that he would be so injured. The two components of the injury alleged by Baur are precisely analogous: the possibility that he will contract vCJD in the future and his present fear that this will happen.
 
 
 72
 Baur attempts to distinguish Lyons by asserting that "Lyons could not allege that he would ever again be stopped by the police, especially since the police for the most part, only stop people who are violating the law. As a result, it was entirely speculative whether he would ever again be stopped and injured by a police chokehold. In contrast, Mr. Baur regularly eats meat, and each time he eats meat, he experiences an injury because the meat may come from a downed animal. Therefore, his injury is certain and direct, unlike Lyon's speculative injury." But this is to assert nothing but that Baur's subjective fear of imminent injury is more reasonable than Lyons' subjective fear of imminent injury. As already noted, however, the Court explicitly held in Lyons that an individual's subjective fear of injury is not sufficient to establish injury in fact. 461 U.S. at 107, n. 8, 103 S.Ct. 1660. Lyons failed to establish injury in fact because he failed to demonstrate any objective basis for concluding that he faced a greater injury than any other citizen of Los Angeles. Baur fails a fortiari because he cannot demonstrate that he faces any objective danger greater than that faced by any other American consumer of meat.
 
 
 73
 Both the majority and Baur make much of the fact that the government has recognized that BSE-infected meat poses a risk to public health. The majority declares that Baur should not be charged with demonstrating that an outbreak of BSE has actually occurred in the United States because it is sufficient for proof of injury in fact that government reports confirm some of the risk factors that Baur has cited, and government agencies have already taken preemptive steps to minimize human exposure to BSE without waiting for definitive evidence that BSE has entered the country, strongly suggesting that they view the potential health risks from BSE as both serious and imminent. Baur himself goes so far as to assert that it is actually illogical for the defendants to simultaneously seek to prevent an outbreak of BSE in this country and to argue that he has no standing to bring the instant lawsuit. It is, Baur declares, "internally inconsistent" for the defendants to claim that he has not established injury in fact on the basis of a possible future outbreak of BSE while they at the same time undertake efforts to prevent such an outbreak.
 
 
 74
 Nevertheless I do not see that the fact that the defendants recognize that BSE poses a risk to public health adds anything to the necessary demonstration that Baur must make that he faces an imminent threat of injury from BSE. The defendants in Lyons had recognized the problematic nature of the use of chokeholds to such an extent that, subsequent to the filing of the lawsuit, they "imposed a six-month moratorium on the use of the carotid-artery chokehold except under circumstances where deadly force is authorized." 461 U.S. at 100, 103 S.Ct. 1660. This added nothing to Lyons' demonstration that he would be especially subject to injury once the moratorium expired.
 
 
 75
 Further, as a general matter, I think it is plain that the fact that the government recognizes something to be a problem, and that it is addressing that problem in a certain fashion, does not at all mean that an individual plaintiff is thereby afforded standing to bring a lawsuit asserting that the government is not addressing that problem in the wisest fashion. On the contrary, the "assertion of a right to a particular kind of Government conduct, which the Government has violated by acting differently, cannot alone satisfy the requirements of Art. III without draining those requirements of meaning." Valley Forge Christian College, 454 U.S. at 483, 102 S.Ct. 752.
 
 
 76
 Both the majority and Baur also argue that standing is demonstrated because the potential future injury Baur faces includes the possibility of death. The majority asserts that because vCJD is "a deadly disease with no known cure or treatment ... even a moderate increase in the risk of disease may be sufficient to confer standing." Baur makes the claim that the fact that "the harm [he] faces is death is all the more reason that he has alleged sufficient injury in fact to satisfy standing."
 
 
 77
 Even though death is a self-evidently irreparable injury, however, I do not see that its possibility makes any particular difference for the standing inquiry. The plaintiff in Lyons asserted the possibility of death by chokehold, and this was not sufficient to invest him with standing. Furthermore, in Whitmore v. Arkansas, the Supreme Court directly held that the fact that the plaintiff in that case was challenging state death penalty procedures had no significance for the question of standing. On the contrary, the Court stated that "[t]he uniqueness of the death penalty and society's interest in its proper imposition" do not "justify a relaxed application of standing principles." 495 U.S. at 161, 110 S.Ct. 1717.
 
 III.
 
 78
 No case cited by either the majority or Baur appears to me to come close to conferring standing upon a similarly situated litigant. The majority asserts that our Circuit has recently "recognized similar types of standing claims." But in both cases cited by the majority, the alleged injuries were by leaps and bounds more imminent than the injuries asserted by Baur. LaFleur v. Whitman, 300 F.3d 256 (2d Cir.2002), involved a claim under the Clean Air Act, as that statute's provisions had been applied by the Environmental Protection Agency to the proposed operation of a single waste processing plant. We held that an individual plaintiff who "alleged that she works in a shopping center adjacent to the proposed site of the facility" had satisfied the requirement of injury in fact because "there can be no question that [she] is likely to be exposed to emissions from the facility." Id. at 270. The imminence of injury posed to nearby residents of a single facility, however, is clearly of no help to Baur, who asserts the imminence of injury merely because he falls into the class of Americans who consume meat. New York Public Interest Research Grp. v. Whitman, 321 F.3d 316 (2d Cir.2003), was also an action under the Clean Air Act. The alleged injury there was arguably more speculative in that the plaintiffs challenged the Environmental Protection Agency's approval of a New York State program for issuing operating permits to potentially polluting facilities. But, as in LaFleur, it was physical proximity to an identifiable danger that was crucial in finding that the injury in fact requirement had been satisfied. Specifically, we held that the plaintiffs' "allegations about the health effects of air pollution and of uncertainty as to whether the EPA's actions expose them to excess air pollution are sufficient to establish injury in fact, given that each lives near a facility subject to [the state program's] permitting requirements." Id. at 325 (emphasis supplied).
 
 
 79
 Baur directs our attention to Roe v. City of New York, 151 F.Supp.2d 495 (S.D.N.Y. 2001), but that case is particularly indicative of how wanting is his demonstration of injury in fact. In Roe, a putative class of heroin addicts challenged the alleged practice of the New York City Police Department of arresting individual participants of a state-authorized needle exchange program. The district court made some effort to distinguish these plaintiffs from the plaintiff in Lyons, noting that "the putative plaintiff class ... claims to be consistently targeted by the NYPD by virtue of their registered participation in, and regular visits to, state-authorized needle exchange programs." Id. at 503. "[U]nlike the individual plaintiff in Lyons," the district court continued, "[c]ourts have repeatedly found that plaintiffs who are members of such an identifiable class of targeted individuals have standing to sue." Id. at 504 (citations omitted). Here, Baur has only alleged that he is part of the vast class of American meat eaters, and he makes no allegation that he has been "targeted" by the USDA practices he challenges.
 
 
 80
 The majority and Baur also cite a number of environmental cases from outside our Circuit. But, as with the environmental cases from our Circuit considered above, all of these are of little help to Baur because they involved plaintiffs who lived in physical proximity to an identifiable — indeed, a quantifiable — environmental harm. Thus, in Mountain States Legal Foundation v. Glickman, 92 F.3d 1228 (D.C.Cir.1996), standing was granted to challenge certain Forest Service policies where the plaintiffs offered the court specific predictions concerning the likelihood of harm. See id. at 1234 (describing "a table comparing the respective effects" of Forest Service policy alternatives which "project[ed] a 5.4% reduction in high-risk fuels acres for alternative 9A, but a 14.2% reduction for alternative 6"). In Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149 (4th Cir.2000), a suit under the Clean Water Act, the plaintiff had "plainly demonstrated injury in fact" because he was "a property owner whose lake lies in the path of [an allegedly polluting facility's] toxic chemical discharge, id. at 156, and because he had produced scientific reports that "show over 500 violations of the company's discharge limits, including unlawful releases of cadmium, copper, iron, lead, and zinc, as well as pH violations." Id. at 157. Similarly, in Central Delta Water Agency v. U.S., 306 F.3d 938 (9th Cir.2002), the Ninth Circuit granted standing to two individual farmers to challenge Department of Interior water policies based upon the existence of precise calculations of possible harm the farmers faced. See id. at 948 ("a Bureau engineer concluded that under the plan now in effect, the Vernalis standard will be violated at least one month a year in 41% of the next 71 years").
 
 
 81
 By contrast, Baur offers nothing but an assertion of the possibility that he, among scores of millions of American meat eaters, will eat meat infected with BSE. He therefore strikes me as being precisely the sort of plaintiff who fails to demonstrate injury in fact because he cannot show that "he is immediately in danger of sustaining some direct injury as a result of" the USDA's policies, as opposed to being able to show "merely that he suffers in some indefinite way in common with people generally." Commonwealth v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).[3]
 
 
 82
 The majority notes that "[i]n the specific context of food and drug safety suits" certain courts have found sufficient injury in fact "where the plaintiff alleges exposure to potentially harmful products." Thus, in Public Citizen v. Foreman, 631 F.2d 969, 974 n. 12 (D.C.Cir.1980), the District of Columbia Circuit held that two members of a consumer protection group had standing to challenge the USDA's approval of nitrites as an additive in the production of bacon. And in Cutler v. Kennedy, 475 F.Supp. 838, 847-50 (D.D.C.1979), overruled on other grounds sub nom., Chaney v. Heckler, 718 F.2d 1174 (D.C.Cir.1983), a district court of that Circuit granted standing to three consumers of certain over-the-counter drugs who alleged that these drugs had improperly received marketing approval from the Food and Drug Administration. But, as opposed to the instant case, the plaintiffs in these pre-Lyons cases alleged that they were at present consuming products which they alleged to be harmful. See also Stauber v. Shalala, 895 F.Supp. 1178, 1188 (W.D.Wis.1995) (where defendants did not challenge that plaintiffs were already consumers of milk treated with an allegedly dangerous hormone, the question of the hormone's actual dangerousness went to the merits of case and was not relevant to the question of standing). Here, as we have seen, Baur only alleges his "apprehension and concern" that he might consume BSE-infected meat. The majority notes that Baur points to evidence in the record to the effect "that a form of BSE may already be present in the United States." But this in itself is speculation insufficient to establish injury in fact, as is any assertion that Baur will be injured by any current presence of BSE.
 
 
 83
 Finally, I am sensitive to the majority's concern that, at the pleading stage, we must avoid "collaps[ing] the standing inquiry into the merits." Such concern, however, does not free us from the Supreme Court's instruction that "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable?" Allen v. Wright, 468 U.S. at 752, 104 S.Ct. 3315.
 
 
 84
 The specific allegations contained in Baur's complaint as to injury in fact are limited to claiming that: 1) an outbreak of BSE could happen in the United States; 2) current USDA policies and practices enhance this risk; and 3) as a consumer of meat, he is concerned about this state of affairs. Even accepting all of this as true, the complaint is utterly devoid of the necessary showing a plaintiff must make to the effect that "the alleged injury suffered is particularized as to him." Raines v. Byrd, 521 U.S. at 819, 117 S.Ct. 2312. That is, he has made no effort whatever to establish that he, as opposed to any other person among the scores of millions of meat eaters in America, faces the hypothetical possibility of eating BSE-infected meat. As the district court feared, a finding that Baur has standing to sue here is to impliedly conclude that "any citizen [has] standing to sue to direct the federal government to take an action to improve health, occupational or environmental safety." To avoid this result, I must conclude that Baur has asserted an "abstract question[] of wide public significance which amount[s] to [a] generalized grievance[] pervasively shared and most appropriately addressed in the representative branches." Valley Forge Christian College, 454 U.S. at 475, 102 S.Ct. 752 (quotations omitted).
 
 IV.
 
 85
 I agree with the majority, and with Baur, that an outbreak of BSE in the United States would be a disastrous event that could possibly injure many people. I also acknowledge that Baur has set forth in the record many disturbing facts concerning the allowance of "downed" livestock into the nation's food supply.[4] It may very well be that Baur is correct that the defendants should take different measures to avoid the occurrence of this event. However, lacking any plausible showing that he faces imminent harm as a result of the measures that the defendants are currently taking, I believe that Baur cannot properly use this Court as vehicle to advance his claims as to proper policy. Accordingly, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 It bears noting in this connection that the federal government's initial efforts to regulate American meat quality were motivated in no small part by public reaction toThe Jungle, Upton Sinclair's 1906 novel about Chicago's meat packing plants. See Roger Roots, "A Muckraker's Aftermath: The Jungle of Meat-Packing Regulation After a Century," 27 Wm. Mitchell L.Rev. 2413 (2001).
 
 
 [2]
 In light of these precedents, I do not understand the majority's assertion that "the Supreme Court has yet to speak directly" on the question of whether threatened harm may satisfy injury in fact
 
 
 [3]
 In response to the majority's query, and for the sake of argument, I would say that "a 0.00011% chance of exposure to BSE contaminated beef" would be insufficient to confer standing. Allowing a lawsuit to go forward on the basis of such a remote harm would be akin to saying that any citizen has standing to sue the National Aeronautics and Space Administration because it currently does not do enough to prevent meteorites from falling to Earth. The more interesting point about the hypothetical, however, is that Baur has not made any demonstration of his chance of exposure to BSE contaminated beef. He merely alleges that he fears such exposure, and the majority, wrongly in my view, deems this alone to be a sufficient demonstration of injury
 
 
 [4]
 See also, Kerri E. Machado, "`Unfit for Human Consumption': Why American Beef is Making Us Sick," 13 Alb. L.J. Sci. & Tech. 801 (2003).